IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| BRENDA SUE ICKES, | ) | Case No. 3:21-CV-0340 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES R. KNEPP II |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION**[1] |

Plaintiff, Brenda Sue Ickes, pro se, seeks judicial review of the final decision of the

Commissioner of Social Security, denying her applications for disability insurance benefits

("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security

Act.  Ickes challenges the administrative law judge's ("ALJ") negative findings, asserting that

the ALJ (i) misevaluated her fibromyalgia and thyroid condition as non-medically determinable

impairment; and (ii) misevaluated her residual functional capacity ("RFC") by failing to include

limitations for her chronic obstructive pulmonary disease ("COPD") and degenerative disc

disease and finding insufficient limitations as to how much she could walk and lift.  Because the

Administrative Law Judge ("ALJ") failed to apply proper legal standards in evaluating Ickes's

severe impairment of degenerative disc disease, I recommend that the Commissioner's final

decision denying Ickes's applications for DIB and SSI be vacated and that Ickes's case be

remanded for further consideration.

---

[1] This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).

# I.      Procedural History

On February 25, 2016, Ickes applied for DIB and SSI, amending her alleged onset day the following day.  (Tr. 379-390).[2]  Ickes alleged that she became disabled on December 17, 2015, due to: (1) chronic back pain; (2) depression, (3) COPD, and (4) glaucoma.  (Tr. 381, 433, 455).  The Social Security Administration ("SSA") denied Ickes's application initially and upon reconsideration.  (Tr. 122-135, 152-165).  She requested an administrative hearing. (Tr. 252-253).

ALJ Paul Sher held a hearing on November 17, 2017 and denied the claim in an April 12, 2018 decision.  (Tr. 34-88, 204-216).  On December 19, 2019, the Appeals Counsel reviewed ALJ Sher's decision, remanding the case to a different ALJ to cure Ickes's challenge under the Appointments Clause to the Constitution.  (Tr. 224-225).

On remand, ALJ Jennifer Overstreet held a hearing on May 13, 2020.  (Tr. 91-121).  At the hearing, Ickes again amended her alleged onset date, alleging disability as of January 26, 2016.  (Tr. 95-97).  The ALJ denied Ickes's claim in a June 2, 2020 decision.  (Tr. 15-27).  At Step Two of the sequential evaluation process, the ALJ found that Ickes's degenerative disc disease was a severe impairment.  (Tr. 18).  At Step Four, the ALJ determined that Ickes had the RFC to perform light work, with the following limitations:

> [Ickes] can occasionally stoop, crouch, kneel, and crawl.  She can occasionally push and pull with the lower extremities.  She can occasionally climb ramps and stairs, but never ladders, ropes, or scaffolds.  She would need to avoid concentrated exposure to fumes, odors, dust, gases, poor ventilation, and other pulmonary irritants.  She should avoid concentrated exposure to extreme cold, extreme heat, and humidity.  She should avoid exposure to workplace hazards such as unprotected heights and moving mechanical parts. She can frequently handle and finger with the right upper extremity.  She is limited to simple tasks in a routine work setting, but not at a production rate pace, for example, no assembly line work.  She is limited to occasional changes in the workplace, and she can occasionally interact with supervisors, coworkers, and the general public.

---

[2] The administrative transcript appears in ECF Doc. 6.

(Tr. 22).  Based on vocational expert ("VE") testimony that a hypothetical individual with Ickes's age, experience, and RFC could perform such available jobs as laboratory sample carrier, assembler of printed products, and mail clerk, the ALJ determined that Ickes was not disabled. (Tr. 25-27).  On December 11, 2020, the Appeals Counsel denied further review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-3).  On February 11, 2021, Ickes filed a pro se complaint to obtain judicial review.  ECF Doc. 1.

## II.  Evidence

### A.  Personal, Educational, and Vocational Evidence

Ickes was born on January 28, 1966 and was 50 years old on the second amended alleged onset date.  (Tr. 95-97, 379).  She obtained her GED and had past work as a gas station cashier and as a sorter at a chemical company.  (Tr. 98-101).

### B.  Relevant Medical Evidence

#### 1.  Physical Medical Evidence

On January 6, 2016, Ickes was seen by Marc Naderer, MD, regarding her diabetes, depression, and COPD.  (Tr. 577).  She reported that she was not checking her blood sugar, her depression had worsened over the past three to four months, and she was upset with her chronic pain and was unable to stay active.  *Id.*  Further, she described being under severe stress because she was applying for disability insurance and had financial troubles.  *Id.*  She also described how her COPD was worse, causing her to have severe shortness of breath with exertions, a cough, chest tightness, and difficulty deeply breathing.  *Id.*  She was also experiencing an upset stomach, abdominal pain, and epigastric pain and burning.  *Id.*

On physical examination, Dr. Naderer noted that Ickes was generally normal, but she had decreased breath sounds and "end expiratory wheezing."  (Tr. 578).  Dr. Naderer found that

Ickes's diabetes was controlled with medication. (Tr. 579). But he changed her COPD medication because her condition was causing severe shortness of breath and decreased breath sounds. *Id.* He also changed her depression medication because of her severe stress and started her on medication for gastritis, as her gastrointestinal symptoms were suggestive of the condition. *Id.*

On February 5, 2016, Ickes again met with Dr. Naderer. (Tr. 582). She reported that her depression had not changed, and she had stopped the medication because it upset her stomach. *Id.* But her COPD had improved, and her gastritis was unchanged. *Id.* Further, she reported experiencing chronic neck and back pain and pain and numbness in her arms and hands. *Id.* On physical examination her lungs sounded clear, her chest was non-tender, her heart had regular rate and rhythm, she had normal bowel sounds, and she had "2+ pedal pulses." (Tr. 583). Dr. Naderer continued Ickes's depression and COPD medications, changed her gastritis medication, and referred her to pain management for her chronic lower back pain. (Tr. 584).

On May 5, 2016, Ickes returned to Dr. Naderer for a follow-up appointment. (Tr. 686). She reported that her depression had worsened, she was under severe stress due to her husband's health problems, and she frequently forgot to take her medication. *Id.* She noted that her COPD and gastritis were stable or controlled with medication. *Id.* Her physical examination results were unchanged since her prior visit, and Dr. Naderer instructed her to take her depression medication but did not otherwise alter her treatment. (Tr. 687-688).

On August 9, 2016, Ickes returned to see Dr. Naderer. (Tr. 698). She reported that her depression was worse, noting increased stress from being denied disability benefits, and that she had stopped her medication. *Id.* Her COPD and gastritis were stable or controlled. *Id.* Her

physical examination results were unchanged, and Dr. Naderer instructed her on her depression medication and anxiety and continued her other treatments.  (Tr. 699).

On June 9, 2017, Ickes met with Dr. Naderer for a follow-up appointment and complaining of pain in her right outer hip.  (Tr. 695).  She indicated she had pain when walking or moving, severe pain moving or lifting her leg, and was very sensitive to touch.  *Id.*  She also reported pain in her lower back and down her legs, a burning sensation in her leg, neck pain, pain in the top of her shoulders, and pain and numbness in her hands and fingers.  *Id.*  She also noted that her depression and COPD were worse without her medication.  *Id.*  Ickes's physical examination results were, generally unchanged, but she had tenderness to palpation on her right outer hip, cervical spine, and lower lumbar spine and tightness in her bilateral trapezius muscles and lumbar paraspinal muscles.  (Tr. 696).  Dr. Naderer's impression was that her hip pain was suggestive of bursitis and he prescribed her medication.  *Id.*  He further assessed that her spinal pain was caused by degenerative disc disease and ordered an x-ray of her spine and started her on pain medication.  *Id.*  He instructed her on her depression and COPD medications and continued their treatments.  (Tr. 696-697).

On June 12, 2017, Ickes had x-rays taken of her cervical spine, which indicated degenerative spondylosis, facet osteoarthritis, and loss of normal cervical lordosis.  (Tr. 797). X-rays of her lumbar spine found mild spondylosis and rotary levocurvature.  (Tr. 798).

On June 19, 2017, Ickes returned to see Dr. Naderer.  (Tr. 707).  She reported that her depression was worse, admitting she was not taking her medication daily, but her COPD had improved, and her gastritis was controlled with medication.  *Id.*  She also reported that her neck and back pain remained, and medication provided only mild relief.  *Id.*  Her physical

5

examination results were unchanged, and Dr. Naderer instructed her on her depression medication and continued her treatments for her other conditions. (Tr. 708).

On June 20, 2017, Ickes underwent an ambulatory assessment at Bellevue Hospital. (Tr. 771). She reported that she stayed on the first floor of her two-story home, had worse pain in the morning to the point where she no longer walked her dog, and her lower back was tight but in the afternoon was a little better. (Tr. 773). She was assessed with chronic neck and lower back pain with limited reach and a general fear of movement. (Tr. 777). Ickes established various short-term goals for increasing her mobility. *Id.*

From June 22, 2017 to August 1, 2017, Ickes attended seven therapy sessions at Bellevue Hospital. (Tr. 780-796). Throughout her sessions, Ickes reported a slight decrease in pain following treatment and while in the water for aquatic therapy, but the pain returned shortly thereafter. *Id.* During her later sessions, however, Ickes was able to increase her repetitions of the exercises and her strength. (*See* Tr. 790, 792).

On September 14, 2017, Ickes met with Dr. Naderer, reporting that her depression had worsened, and she had increased stress because of a recent move. (Tr. 710). She also reported increased pain all over, paresthesia, numbness, tingling, and increased sensitivity to touch. *Id.* Her physical examination results were unchanged. (Tr. 711). Dr. Naderer changed her depression medication and assessed that her increased pain generally and nerve pain were "likely fibromyalgia." *Id.* He started her on a new medication to combat the pain. *Id.*

On October 23, 2017, Ickes saw Dr. Naderer. (Tr. 712). She reported that her depression was slightly better, her fibromyalgia was unchanged, and her COPD was stable. *Id.* She indicated that her gastritis was worse, but she had run out of medication, which had controlled it.

6

*Id.* Her physical examination results were unchanged; Dr. Naderer increased her depression and fibromyalgia medications and continued her gastritis and COPD treatments.  (Tr. 713).

On February 1, 2018, Ickes returned to Dr. Naderer, complaining of knee pain.  (Tr. 846). She reported that the pain was in both knees but was worse on the right and included frequent popping, clicking, grinding, and occasional swelling.  *Id*.  She also reported that her carpal tunnel symptoms were worsening, with increased numbness and tingling in her right hand that made it difficult for her to hold a steering wheel or phone and caused her to drop things.  *Id*.  Her physical examination results were unchanged, and Dr. Naderer diagnosed her with bilateral chronic knee pain, prescribing her medication for it, and ordered x-rays.  (Tr. 847).  He also diagnosed her with carpal tunnel syndrome and prescribed her medication.  *Id*.  The x-rays did not indicate any acute bone abnormality or significant degenerative changes.  (Tr. 848).

On February 21, 2018, Ickes went to Bellevue Hospital complaining of chest pain that went into her back, up to her jaw, and down both arms.  (Tr. 750).  On physical examination, Ickes was noted as cooperative, not in distress, and otherwise normal.  (Tr. 754).  Ickes was admitted, as further tests were needed to determine the cause of her pain, but she was in stable condition.  (Tr. 758-759).  She was discharged the following day after the doctor concluded her pain was likely an acute exacerbation of her COPD.  (Tr. 761-762).

On March 9, 2018, Ickes saw Dr. Naderer for a follow-up visit regarding her hospitalization.  (Tr. 843).  Since her hospitalization, she had had mild chest pain, but it was not as intense.  *Id.*  Dr. Naderer ordered that she undergo a stress test, which showed normal nuclear myocardial perfusion.  (Tr. 749, 844-845, 866).

On May 2, 2018, Ickes was seen by Dr. Naderer for worsening carpal tunnel pain, which she described as severe with numbness.  (Tr. 841).  She noted that her use of a brace had not

helped, and her condition had made it hard for her to use her arm, weakened her grip, and caused her to drop things.  *Id.*  Her physical examination results were unchanged, and Dr. Naderer prescribed new medication and referred her to an orthopedist.  (Tr. 842).

On May 21, 2018, Ickes was seen by physician's assistant Matthew Meyer, PA, for paresthesia and carpal tunnel syndrome in her right hand.  (Tr. 810).  They discussed Ickes' history, prior attempts at relieving her pain, and possible treatment options.  *Id.*  She was started on pain medication.  *Id.*  Her physical examination results were generally normal except she reported subjective intermittent paresthesia involving her entire right hand.  (Tr. 812).

On June 4, 2018, Ickes was seen again by PA Meyer.  (Tr. 806).  Given that conservative treatments were unsuccessful, they discussed her undergoing surgery on her right hand.  *Id.* And, on June 12, 2018, Ickes underwent surgery on her right hand for her carpal tunnel syndrome; no complications were reported.  (Tr. 874).  During her follow-up appointments, Ickes reported either not having or only intermittent numbness or tingling.  (Tr. 802-805).

On August 8, 2018, Ickes saw Dr. Naderer, reporting that her fibromyalgia had worsened, and she had increased severe pain in her leg, including tightness and spasms, and burning in her feet and legs.  (Tr. 836).  She noted that she was not checking her blood sugar or trying to follow her diet, her depression and COPD were stable, and her gastritis was controlled with medication. *Id.*  Her physical examination results were generally unchanged.  (Tr. 837).  Dr. Naderer instructed Ickes on controlling her diabetes and added an additional medication for her fibromyalgia.  *Id.*  He did not change her treatment for depression or COPD.  *Id.*

On August 23, 2018, Ickes underwent an ultrasound of her thyroid, ordered by Dr. Naderer, which identified that she had multi-nodular goiter.  (Tr. 743).  A subsequent

scintigraphic image of her thyroid showed abnormally elevated radiotracer uptake in the right thyroid lobe than the left.  (Tr. 815).

On December 26, 2018, Ickes went to Bellevue Hospital complaining of pain that was centered in her chest, went through to her back, and up to her right jaw.  (Tr. 721).  On physical examination, she was observed to have mild distress and be anxious but was otherwise normal.  (Tr. 725-727).  Ickes underwent an electrocardiogram, which indicated normal results, and a CT scan of her heart that did not show any evidence of an acute pulmonary embolism but did show a small nodule in the anterior right upper lobe.  (Tr. 729).  A progress note during her visit reported that Ickes's condition had improved, and she was discharged.  (Tr. 729-730).

On November 21, 2018, Ickes saw Dr. Naderer, complaining of worsening fibromyalgia.  (Tr. 834).  She reported that she had severe pain in her left leg that felt like an electric shock.  *Id.*  She also felt weakness in that leg, pain when walking or standing, and was sensitive to touch.  *Id.*  She reported that she did not check her blood sugar, but her depression, gastritis, and COPD were controlled or stable.  *Id.*  Her physical examination results were unchanged, and Dr. Naderer instructed her on controlling her diabetes through diet, altered her fibromyalgia medication, and continued her other treatments.  (Tr. 835).

On January 2, 2019, Ickes met with Dr. Naderer to transition to his care following an emergency room visit for chest pain.  (Tr. 831).  Overall, she reported that her pain was stable but still existed in her back, legs, and chest.  *Id.*  Her physical examination results were unchanged, and Dr. Naderer's impression was that her fibromyalgia pain had improved despite her recent pain.  (Tr. 832).  He continued her other medications.  *Id.*

From April 4, 2019 to February 3, 2020, Ickes saw Dr. Naderer about every four to six months.  (Tr. 819-830).  She generally reported that she was not checking her blood sugar but

9

tried to stay on a diabetic diet, her fibromyalgia pain was stable or tolerable, her depression and gastritis were controlled with medication, and her COPD was stable. *Id.* Her physical examination results were unchanged from her prior visits, and Dr. Naderer maintained her medications. *Id.* During her last visit, she notably indicated that her medication controlled her pain to the point she could complete her activities of daily living. (Tr. 819).

### C. Relevant Opinion Evidence

#### 1. Consultive Examiner – Thomas Evans, Ph.D.

On April 21, 2016, Ickes was evaluated by Thomas Evans, PhD, regarding her mental health. (Tr. 645). She reported that she had never undergone mental health counseling and she began having symptoms of depression in 2012 when her physical problems worsened. (Tr. 646). She rated her depression as an 8 out of 10 and her symptoms included: depressed mood, fatigue, no motivation, low self-esteem, feelings of hopelessness and helplessness, anhedonia, poor concentration and short-term memory, and daily crying episodes. *Id.*

Dr. Thomas reported that Ickes's grooming and hygiene were good and that, while she walked unassisted, she had a significant limp, her gait was unsteady, and she was hunched over. (Tr. 647). She was in a "moderate degree" of physical distress throughout the evaluation. *Id.* Regarding her speech and thoughts, Dr. Thomas observed that there was no loosening of associations or tangential speech and her speech was normal in rhythm, rage, and volume. *Id.* As to her mood and affect, Ickes made good eye contact but described disruptive sleep, low appetite, and a "horrible" and depressed mood. *Id.* Dr. Thomas observed that her mood was euthymic, which was consistent with her affect, but her affect was also slightly tearful. *Id.*

Functionally, Dr. Thomas assessed that Ickes had no difficulties understanding, remembering, and carrying out instructions. (Tr. 648). She displayed good attention and

concentration, maintaining focus without difficulty.  (Tr. 649).  However, Dr. Thomas noted Ickes's reports that she needed to write things down, had stopped cooking because she would forget she was cooking if she walked away, frequently misplaced things, and had difficulty reading short newspaper articles.  *Id.*  He assessed that she performed poorly on the mental status examination.  *Id.*  In assessing her ability to respond appropriately to supervision and coworkers, he noted she reported always having gotten along with supervisors and coworkers and had no problems taking directives from authority figures.  *Id.*  As to her ability to respond to work-place pressures, Dr. Thomas noted that Ickes's mood symptoms began after she left the workplace.  *Id.*

### 2.     State Agency Consultants

On April 19, 2016, Lynne Torello, MD, reviewed Ickes's physical functional limitations based on the medical evidence.  (Tr. 130).  She found that there had not been significant changes in Ickes's medical records from her prior evaluation in 2015 and adopted that ALJ's RFC.  *Id.* On July 18, 2016, Gerald Klyop, MD, reconsidered Ickes's physical limitations and agreed with Dr. Torello.  (Tr. 160).

On May 3, 2016, Paul Tangerman, PhD, reviewed Ickes's mental functioning limitations based on the medical evidence.  (Tr. 130-132).  As to her understanding and memory, he found that Ickes was moderately limited in her ability to understand and remember detailed instructions but was otherwise not significantly limited.  (Tr. 130-131).  As to her ability to sustain her concentration and persist, he found that Ickes was moderately limited in her ability to: (1) carry out detailed instructions; (2) maintain attention and concentration for extended periods; and (3) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  (Tr. 131).  Otherwise, Dr. Tangerman found that she was not significantly limited.  *Id.*

He also found that Ickes was moderately limited, as to her social interactions, in her ability to interact appropriately with the general public but was not otherwise significantly limited. (Tr. 131-132).  He found that she did not have any adaptation limitations.  (Tr. 132).

On July 22, 2016, Cindy Matyi, PhD, reconsidered Ickes's mental functioning limitations based on the medical evidence.  (Tr. 160-162).  She generally agreed with Dr. Tangerman, but she found that Ickes was also moderately limited in her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and, as to her adaptation, she was moderately limited in her ability to respond appropriately to changes in the work setting but was otherwise not significantly limited.  *Id.*

### D.    Relevant Testimonial Evidence

Ickes testified at the hearing.  (Tr. 97-113).  Ickes testified that she had gotten her GED and she did not drive because, if she drove for too long, shooting pain went up her hips and feet. (Tr. 98).  From 2009 to 2013, she had worked for a company as a sorter who went through garbage bales for recyclable materials, eventually being promoted to a supervisory role. (Tr. 98-101).  In that position, she needed to lift about 30 pounds.  (Tr. 100-101).  She had also worked as a cashier at a gas station where she lifted about 30 to 40 pounds.  (Tr. 101-102).

Ickes explained that she was right-handed, and she had carpal tunnel syndrome symptoms including numbness, being unable to open jars, and tingling.  (Tr. 102-103).  The most she could currently pick up was a gallon of milk.  (Tr. 103).  Based on her degenerative disc disease, she could stand for about five minutes before her hips and knees would start to hurt and she would have numbness and tingling.  *Id.*  Her COPD limited her to walking to her yard.  (Tr. 104).  She explained that she had tried injections and therapy for her back, but they did not work.  *Id.*

Ickes testified that she eventually left her job as a sorter because she could not perform her duties, as the work area was up 15 stairs and she could not write, operate some of the machinery, or lift heavy things.  (Tr. 104-105).  She was able to go on short-term disability but when that ended, she was terminated.  (Tr. 105).  As to her COPD, she used inhalers and explained that walking too far would make her short of breath.  *Id.*  As to her depression, she stated that she was diagnosed around 2013 and medicine helped, but she remained moody and tearful.  (Tr. 105-106).  She had never been hospitalized or seen a psychologist or psychiatrist for her depression.  *Id.*  She had tried seeing a counselor but felt worse after sessions.  *Id.*  The "deterioration" in her neck caused her to have migraines lasting for two days.  *Id.*

Ickes testified that her typical day was getting up and laying on the couch for most of the day.  (Tr. 107).  She was diagnosed with fibromyalgia in 2016 or 2017 but had never seen a rheumatologist.  *Id.*  Her carpal tunnel also affected her left hand, and the doctors wanted her to have surgery on it.  (Tr. 108).  She thought her depression symptoms had not changes over time but had become better controlled.  (Tr. 108-109).  She struggled with her memory, forgetting things unless she wrote them down.  (Tr. 109).  She no longer cleaned, went grocery shopping, or cooked, and the longest she would sleep was for about four hours before waking up and taking more medication.  (Tr. 109-110).  Regarding side-effects, she indicated that some of her medication made her sleepy and, although unsure whether caused by medication, she had no motivation to do anything.  (Tr. 110-111).  Her ankles also swelled up about twice a week, which she took medication to prevent, and she did not concentrate well.  (Tr. 112).

### III.    Law & Analysis

#### A.    Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). "Substantial evidence" is not a high threshold for sufficiency. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "It means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation marks omitted). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quotation marks omitted). Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). And "it is not necessary that this court agree with the Commissioner's findings," so long as it meets this low standard for evidentiary support. *Rogers*, 486 F.3d at 241. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."). And the court will not uphold a decision when the Commissioner's reasoning does "not build an accurate

and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked.").

### B.      Step Two: Impairment Findings

Liberally construed, Ickes contends that the ALJ failed to adequately consider her fibromyalgia and thyroid conditions when evaluating her medically determinable impairments. *See* ECF Doc. 8 at 2-3.  The Commissioner disagrees.  ECF Doc. 9 at 11-17.

At Step Two, a claimant has the burden to show that she has *at least one* "severe impairment."  20 C.F.R. § 404.1520(a)(4)(ii), (c).  A "severe impairment" is a medical condition that has more than minimal effect on mental or physical function and is expected to last for 12 months or cause death.  20 C.F.R. §§ 404.1509, 404.1522; *Salmi v. Sec'y of Health & Human Servs.*, 744 F.2d 685, 691 (6th Cir. 1985).  This is a threshold inquiry "intended to 'screen out totally groundless claims.'"  *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 576 (6th Cir. 2009) (quoting *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir. 1985)).  And whether a condition qualifies as a "medically determinable impairment" is determined exclusively on the basis of objective medical evidence.  20 C.F.R. § 404.1521 ("We will not use your statement of symptoms, a diagnosis, or a medical opinion to establish the existence of an impairment(s).").  If the ALJ concludes that a condition is not a "medically determinable impairment," the ALJ need not consider the condition in assessing the RFC.  *Rouse v. Comm'r of Soc. Sec.*, No. 2:16-cv-0223, 2017 U.S. Dist. LEXIS 6172, at *11 (S.D. Ohio Jan. 17, 2017).

As to fibromyalgia specifically, the Sixth Circuit has held that it may be a "severe impairment," but its evaluation presents challenges because the disease has no known cause or cure.  *Herzog v. Comm'r of Sec. Sec.*, No. 2:16-CV-244, 2017 U.S. Dist. LEXIS 82965, *18 (S.D. Ohio May 31, 2017) (citing *Preson v. Sec'y of Health and Human Servs.*, 854 F.2d 815, 818 (6th Cir. 1988)).

Social Security Ruling 12-2p provides guidance on how to determine whether a claimant has a medically determinable impairment of fibromyalgia.  *Luukkonen v. Comm'r of Soc. Sec.*, 653 F. App'x 393, 398 (6th Cir. 2016).  Under SSR 12-2p, an ALJ must find that a claimant has a medically determinable impairment of fibromyalgia if: (i) a physician diagnosed the claimant with fibromyalgia after a physical exam and review of her medical history; (ii) the diagnosing physician presents evidence that satisfy the Section II.A or Section II.B criteria; and (iii) the diagnosing physician's diagnosis is not inconsistent with other evidence in the record.  SSR 12-2p, 2012 SSR LEXIS 1, at *3-4.

Sections II.A. and II.B of SSR 12-2p establish two, alternative sets of criteria for establishing a medically determinable impairment of fibromyalgia.  *Id.* at *4.  The Section II.A. criteria require:

1. A history of widespread pain – that is, pain in all quadrants of the body (the right and left sides of the body, both above and below the waist) and axial skeletal pain (the cervical spine, anterior chest, thoracic spine, or low back) that has persisted (or that persisted) for at least 3 months' and which may fluctuate in intensity and may not always be present;

2. At least 11 positive tender points on physical examination, which must be found in specific locations; and

3. Evidence that other physical and mental disorders that could cause the symptoms or signs were excluded, such as imaging and other laboratory tests (for example, complete blood counts, erythrocyte sedimentation rate, anti-nuclear antibody, thyroid function, and rheumatoid factor).

*Woodberry v. Berryhill*, No. 3:17-CV-2620, 2018 U.S. Dist. LEXIS 223361, *58 (N.D. Ohio

Nov. 9, 2018) (internal quotation marks omitted); *see also* SSR 12-2p, 2012 SSR LEXIS 1,

at *6-7.  Alternatively, Section II.B. criteria requires:

1.  A history of widespread pain as described above;

2.  Repeated manifestations of six or more fibromyalgia symptoms, signs, or co-occurring conditions, especially manifestations of fatigue, cognitive or memory problems, waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome; and

3.  Evidence that other disorders that could cause these repeated manifestations of symptoms, signs, or co-occurring conditions were excluded.

*Woodberry*, 2018 U.S. Dist. LEXIS 223361, *58-59; SSR 12-2p, 2012 SSR LEXIS 1, at *7-9.

Co-occurring conditions include anxiety disorder, chronic fatigue syndrome, irritable bowel

syndrome, interstitial cystitis, gastric reflux disorder, migraine, or restless leg syndrome.  *See*

SSR 12-2p, 2012 SSR LEXIS 1, at *n.10.

Although a close question, I find that the ALJ applied the proper legal standards or

harmlessly erred in evaluating Ickes's fibromyalgia and thyroid conditions and reached a

determination supported by substantial evidence.  As to the ALJ's evaluation of Ickes's

fibromyalgia, I find that she met her obligations under the regulations.  Barely.  She stated "[a]s

described below, the record is devoid of evidence to establish the claimant has the impairment of

fibromyalgia."  (Tr. 18).  However, the promised description "below" was absent.  (*See*

Tr. 19-25).  The remainder of the ALJ's analysis was a statement that SSR 12-2p's criteria had

not been met.  (Tr. 18).  Although she later summarized the medical evidence, her summary

never made a specific reference to fibromyalgia, and even omitted Dr. Naderer's statement that

her pain was "likely fibromyalgia."  (*See* Tr. 22-25).

What saves the ALJ's determination, however, is that we do not look at the ALJ's discussion of any step of the sequential evaluation process in isolation but rather at the decision as a whole.  *See Buckhannon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678–79 (7th Cir. 2010) (noting that the court "read[s] the ALJ's decision as a whole and with common sense").  Based on the evidence summarized, we can see that Ickes's medical treatment record did not contain a clear fibromyalgia diagnosis (a statement that the condition was "likely fibromyalgia" was not definitive); there was no evidence that other physical or mental disorders had been excluded, any analysis of Ickes's tender points on examination, or finding that other co-occurring conditions had been excluded as causes of her symptoms and pain.  *See* SSR 12-2p, 2012 SSR LEXIS 1; *Woodberry*, 2018 U.S. Dist. LEXIS 223361, *58-59.  Moreover, the lack of evidence in the record supports the ALJ's finding, because (1) Dr. Naderer appeared to make a preliminary diagnosis when he assessed that Ickes's condition was "likely fibromyalgia;" (2) no treatment notes indicated testing to exclude other conditions or co-occurring conditions was done; and (3) no treatment notes indicated that a trigger-point analysis was done.  *Biestek*, 139 S. Ct. at 1154.  A more thorough discussion would have been wise.

But because the ALJ's finding rested on the *absence* of information in the record rather than the presence of specific treatment notes or findings, I cannot find that her minimal description was ultimately insufficient to allow for meaningful judicial review.  *See Wenz v. Comm'r of Soc. Sec.*, No. 1:19-CV-00734, 2020 U.S. Dist. LEXIS 23641, at *40-53 (N.D. Ohio Jan. 6, 2020) (recommending that the Commissioner's decision be remanded because the ALJ failed to discuss fibromyalgia at Step Two or elsewhere in the opinion and the ALJ's analysis found support in aspects of the medical evidence identified as being improper bases to reject a fibromyalgia impairment or limitation).  It stands to reason that an ALJ cannot possibly be

required to list every condition she *does not* find to be present.  But where, as here, the claimant alleges she has a condition, the ALJ should recite the presence or absence of the diagnostic criteria – which the ALJ identified.

As to Ickes's thyroid condition, although the ALJ failed to consider the condition at Step Two, she considered it when she discussed Ickes's RFC and, thus, any Step Two error was harmless.  The ALJ identified that Ickes had numerous severe impairments and, as such, the ALJ's failure to discuss Ickes's thyroid condition was harmless – provided the ALJ considered it at other steps.  *See Nejat*, 359 F. App'x at 577; (Tr. 18).  When summarizing the evidence at Step Four, the ALJ remedied the Step Two error, by referring to Ickes's thyroid test which showed abnormally elevated radiotracer uptake.  (Tr. 24).  Although the ALJ did not provide a more substantive discussion of the evidence or any possible implication the test may have had for Ickes's limitations, the reference does show that the ALJ was aware of and considered Ickes's thyroid condition.  *Nejat*, 359 F. App'x at 577.  And Ickes has not pointed to any evidence to the contrary which would demonstrate that the ALJ's consideration was inadequate, nor has she asserted that her thyroid specifically caused her to have particular limitations.  *See generally* ECF Doc. 8.  Even if she had, a preponderance of evidence alone would be insufficient to overcome the evidence supporting the ALJ's decision in that regard.  *O'Brien*, 819 F. App'x at 416.  Accordingly, the ALJ's considerations of the plaintiff's medical conditions fell within her "zone of choice."  *See Mullen*, 800 F.2d at 545.

### C.      Step Four: Residual Functional Capacity

Liberally construed, Ickes contends that the ALJ erred in evaluating her RFC limitations.  ECF Doc. 8 at 2-3.  Specifically, she argues that she experienced limitations from her degenerative disc disease, COPD, and anxiety, as well as various side effects from her

19

medication that the ALJ did not properly consider in evaluating her limitations, particularly her walking and lifting.  ECF Doc. 8 at 2-3.  Ickes appears to contend that the ALJ should not have relied on the VE's testimony that she should avoid working in areas with pulmonary irritants, based on her assertion that such jobs are unavailable in her area.  ECF Doc. 8 at 2-3.  The Commissioner disagrees. ECF Doc. 9 at 10-17.

At Step Four of the sequential analysis, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence.  20 C.F.R. §§ 404.1520(e), 416.920(e).  The RFC is an assessment of a claimant's ability to do work despite her impairments. *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)).  "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"  SSR 96-8p, 1996 SSR LEXIS 5.  Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant.  20 C.F.R. §§ 404.1529(a), 416.929(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5.

Further, the ALJ may determine that a claimant can perform a significant number of jobs in the national economy by relying on a vocational expert's testimony that the claimant has the ability to perform specific jobs.  *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 238 (6th Cir. 2002).  A vocational expert's testimony in response to a hypothetical question is substantial evidence when the question accurately portrays the claimant's RFC and other vocational characteristics.  *See id.* (stating that "substantial evidence may be produced through reliance on the testimony of a vocational expert (VE) in response to a 'hypothetical' question, but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments" (internal quotation marks omitted)).

Although the ALJ applied the proper standards and reached determinations supported by substantial evidence regarding some of Ickes's conditions, the ALJ failed to apply the proper legal standards in evaluating Ickes's degenerative disc disease and, as a result, Ickes's contentions regarding her walking and lifting limitations cannot be properly evaluated.  Under Step Two, the ALJ found that Ickes's degenerative disc disease constituted a severe impairment. (Tr. 18).  The ALJ made this finding and conducted an analysis of the objective medical evidence in evaluating Ickes's RFC; but the ALJ never thereafter referred to Ickes's back condition nor provided any analysis as to how Ickes's degenerative disc disease interacted with her other conditions when she made her RFC findings.  *See* SSR 96-8p, 1996 SSR LEXIS 5; (Tr. 22-25).  In fact, in her summary of the evidence, the ALJ never used the words "degenerative disc disease" or even "back pain."  (*See* Tr. 22-25)  The fact that some of Ickes's other conditions, such as her COPD, could also have created the need for the same restrictions we might assume were caused by a back condition (such as a standing or walking duration limit), further confounds the court's ability to evaluate the ALJ's findings.

The Commissioner contends that the ALJ considered this evidence based on the statement that she "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." ECF Doc. 9 at 15; (Tr. 22).  The Commissioner seeks to bolster this with the fact that the ALJ "alone" has the responsibility to make a determination regarding Ickes's functional capacity. ECF Doc. 9 at 15.  While both those statements are true, a third one is as well – the court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result."  *Fleischer*, 774 F. Supp. 2d at 877; *see also* *Shrader*, 2012 U.S. Dist. LEXIS 157595 ("If relevant evidence is not mentioned, the court

21

cannot determine if it was discounted or merely overlooked.").  Even if we examine the ALJ's treatment of Medical Listing 1.04 relating to disorders of the spine, the ALJ's analysis was limited to identifying portions of the listing's requirements that are not shown, with no comparative discussion of what Ickes's records did demonstrate or how they may have missed the mark.  (Tr. 19).  In short, the ALJ never discussed Ickes's actual back condition.  *Id.*

It is worth noting, as well, that the record contains a plethora of records, treatment notes, and subjective symptoms complaints by which the ALJ should have been able to discuss Ickes's back condition.  For example, Dr. Thomas observed her walking hunched over with a limp and she *repeatedly* reported back pain to her physical therapists – pain which physical therapy did not appear to alleviate.  (*See* Tr. 647, 780-795).  Although the ALJ is not required to discuss every piece of evidence, neither of these – or any other records relating to back pain – were directly referenced by the ALJ.  (*See* Tr. 22-25).  And – even if an independent review these records might generate support for the ALJ's findings, such support would not remedy the ALJ's lack of analysis.  *Steckroth v. Comm'r of Soc. Sec.*, No. 11-10473, 2012 U.S. Dist. LEXIS 44895 (E.D. Mich. March 30, 2012) (quoting *Hyatt Corp. v. NLRB*, 939 F.2d 361, 367 (6th Cir. 1991) ("Courts are not at liberty to speculate on the basis of an administrative agency's order. . . . [nor is the court] free to accept 'appellate counsel's rationalization for agency action in lieu of reasons and findings enunciated by the Board.") (citations omitted).  Because it is unclear whether (i) the ALJ considered Ickes's degenerative disc disease, and (ii) what, if any, limitations the ALJ may have found based on the disease, the ALJ failed to meet her obligation to build a logical bridge. *See Fleischer*, 774 F. Supp. 2d at 877.  And the court should remand on that basis.

As to Ickes's remaining challenges to the ALJ's treatment of her COPD and anxiety, the ALJ's discussion of those conditions was far more substantial, demonstrating that she did in fact

consider the limitations those conditions may have caused.  Specifically, the ALJ noted both the development and improvement of Ickes's COPD and depression/anxiety over the course of her treatment.  (*See* Tr. 22-25).  Moreover, her findings were supported by substantial evidence, including: (1) Ickes's reports to Dr. Naderer that her COPD was generally stable or controlled with medication (Tr. 582, 686, 695, 698, 707, 712, 819-828, 834, 836); and (2) Ickes's reports that her medication improved her depression and, more recently, the lack of complaints to Dr. Naderer about her depression/anxiety (Tr. 695, 712, 834, 836, 841, 846).  *See Biestek*, 139 S. Ct. at 1154.

However, Ickes also challenges the ALJ's limitations regarding her ability to walk and lift.  *See* ECF Doc. 8 at 2-3.  Further analysis of those claims is impossible at this time because the ALJ failed to demonstrate that those limitations were included in the RFC because of Ickes's degenerative disc disease.  SSR 96-8p, 1996 SSR LEXIS 5; *Walton*, 773 F. Supp. 2d at 747. Additionally, because of the error in evaluating Ickes's severe impairments, we need not evaluate whether the ALJ erred in relying on the VE's testimony as the testimony would be based on hypothetical questions that were, in turn, premised on a suspect RFC.  Accordingly, I recommend the Commissioner's final decision be vacated and the case be remanded for further consideration of Ickes's condition and limitations.

## IV.    Recommendation

Because the ALJ failed to apply proper legal standards in evaluating Ickes's degenerative disc disease, I recommend that the Commissioner's final decision denying Ickes's applications for DIB and SSI be vacated and that Ickes's case be remanded for further consideration.


Dated: April 22, 2022

Thomas M. Parker
United States Magistrate Judge

---

**Objections, Review, and Appeal**

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge.  Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C. § 636(b)(1); Local Rule 72.3(b).  Properly asserted objections shall be reviewed de novo by the assigned district judge.

* * *

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation.  *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019).  Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).  Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 U.S. Dist. LEXIS 100383, *6 (W.D. Ky. June 15, 2018) (quoting *Howard*).  The failure to assert specific objections may in rare cases be excused in the interest of justice.  *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).